UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

David Michael Tscheu,                                    Civil No. 13-2099 (JNE/FLN)

                        Petitioner,

                                                         **ORDER AND**
        v.                                               **REPORT AND**
                                                         **RECOMMENDATION**
Michelle Smith,

                        Respondent.
_____

David Michael Tscheu, *pro se*, for Petitioner.
Donald Ryan, Matthew Frank, and James Early for Respondent.
_____

**THIS MATTER** came before the undersigned United States Magistrate Judge on a Petition

Under 28 U.S.C. § 2254 for Writ of Habeas Corpus by a Person in State Custody filed by David

Michael Tscheu ("Petitioner") (ECF No. 1) and Petitioner's motion to amend his petition (ECF No.

23). This matter was referred to the undersigned for Report and Recommendation pursuant to 28

U.S.C. § 636 and Local Rule 72.1. For the reasons set forth below, this Court recommends that

Petitioner's petition for writ of habeas corpus be **DENIED**. Additionally, Petitioner's motion to

amend his petition is **DENIED as moot**.

## I. BACKGROUND

Following an August 2006 jury trial in Crow Wing County District Court, a jury convicted

Petitioner of first-degree murder while committing first-degree criminal sexual conduct causing

personal injury (in violation of Minn. Stat. § 609.182(a)(2)) in connection with the death of Bonita

Thoms. Petitioner was sentenced to life in prison. The undersigned accepts the facts of this case as

stated by the Minnesota Supreme Court:

The evidence at trial established that Bonita Thoms was last seen alive on Friday,

February 25, 2005. She went to work that day, and records from a local grocery store confirm that she made purchases at the store on February 25, presumably during her lunch break. Records from Thoms's employer indicate that she left work at approximately 3:35 p.m. A witness testified to seeing Thoms in her car, apparently on her way home, sometime between 3:30 and 4:35 p.m. and when she was approximately 5 miles from her home.

Later that evening, Thoms's stepson J.B. tried to reach Thoms by telephone, but was unsuccessful. J.B. telephoned Thoms again the morning of Saturday, February 26, but he again failed to reach her. J.B. wanted to tell Thoms that he was coming to her residence in Aitkin, Minnesota, to pick up a camper that he had stored on her property.

J.B. arrived at Thoms's home at approximately 3:30 p.m. on Saturday, February 26. When he arrived, J.B. saw Thoms's red Buick LeSabre parked in the driveway. He also noticed that the water was running on the ground outside of the house, and that Thoms's dog, which normally slept indoors, was outside and had been outside long enough for ice crystals to form on his face. J.B. entered Thoms's home through the closed but unlocked front door; he called out to Thoms, but received no response. J.B. then heard the shower running. When he opened the bathroom door, J.B. found Thoms dead in the bathtub. He then called 911.

Crow Wing County Deputy Sheriff Donald Downie arrived at Thoms's home around 4:08 p.m. in response to the 911 call. Downie testified that there were no signs of fresh forced entry to the front door, and that other doors to the home were still locked when he arrived. In the bathroom he noted that an "older" shower curtain, which had been repaired with masking tape that had yellowed, was intact and three-quarters closed. A pair of women's underwear was hanging from the shower rod and three pairs were on the floor. Thoms was laying on her right side in the tub and was nude except for her brassiere and a wrist watch, which had been pushed up onto her left hand. The shower was spraying cold water onto Thoms's head. The bathtub was filled with water to the overflow drain, and most of Thoms's head, including her mouth and nose, were submerged. Thoms's eyeglasses were floating in the water. Downie turned off the shower and drained the tub. Downie then photographed the scene, and the photographs were introduced into evidence at trial.

Downie also testified that he saw a newspaper from February 25 that appeared unread, and several perishable food items on the counter in Thoms's kitchen. These items matched those Thoms purchased at the grocery store on February 25, and the State offered testimony that Thoms normally would have immediately placed the perishable items into the refrigerator upon returning home. Although the house was searched, Thoms's purse and keys, usually kept on the kitchen counter, were never located.

. . .

In addition to the background evidence about Thoms and the crime scene evidence, the State also offered testimony from Dr. Janis Amatuzio who performed the autopsy. Dr. Amatuzio determined that Thoms died sometime between 3:18 and 9:18 p.m. on Friday, February 25, as a result of asphyxia from drowning. She concluded that Thoms's death was a homicide based on bruise patterns on the body, the way the body was found, and the significant amount of water in Thoms's stomach and lungs. Dr. Amatuzio noted that Thoms was taking a number of medications—including a blood thinner that caused her to bruise easily—but she ruled out cardiac arrhythmia as the cause of death.

. . .

Dr. Amatuzio also conducted a sexual assault exam as part of the investigation. There were no signs of injury to the vagina, perineum, rectum, or anus. Hemorrhoids around the outside of the anus were also uninjured. When asked whether it would be unusual for someone's anal cavity not to show signs of injury after forced intercourse, Dr. Amatuzio testified that the anus may or may not show evidence of tears or injury, depending on the degree and rapidity of the force used. She also noted that hemorrhoids could cause anal intercourse to be uncomfortable, but that they would not cause any obstruction to the anus.

Semen was found inside Thoms's rectum that matched Tscheu's DNA. DNA analyst Kristine Deters testified that, statistically speaking, such a match would not be expected to occur more than once among the world's population. Semen consistent with Tscheu's DNA was also found on Thoms's perineum. Deters estimated that 99.95% of the general population could be excluded as contributors to the perineal deposit.

No semen was found in Thoms's vagina. Deters was asked about the possibility of seminal drainage from the vagina into the rectum after vaginal intercourse. She testified that typically vaginal intercourse causes an abundant amount of sperm in the vaginal cavity and only occasional sperm in the rectal cavity.

Finally, regarding the DNA evidence, the State showed that a partial male DNA profile was obtained from Thoms's fingernail clippings. Statistically speaking, 0.9 to 7.4% of the population, depending on ethnic background, could be expected to be included in the group having this particular profile. This profile was tested against other known samples of male individuals who submitted DNA samples to the Bureau of Criminal Apprehension (BCA) during the course of the investigation. Except for Tscheu and his father, all known samples were excluded.

The State's evidence also explained the investigation of Tscheu. Tscheu was initially

identified as a person of interest because Thoms's stepson identified him as someone who had visited Thoms's residence in the past. Deputy Downie first contacted Tscheu about Thoms's death on March 17, 2005. At that time, Tscheu said that the last time he had seen Thoms was shortly before August 2004. The record reflects that on the day of Thoms's death, Tscheu and his father drove together to a construction site in Crosslake. Tscheu's timesheet indicated that he worked 5.5 hours on that day. Tscheu's father told police that he and Tscheu visited a Fleet Farm after work to purchase automobile parts. Tscheu told police that he then went home and changed the engine in his van that night. Downie estimated that it would take about 27 minutes to drive from the job site in Crosslake to Thoms's residence in Aitkin.

When asked about Thoms's death, Tscheu told police that he heard from his mother or a man named B.B. that Thoms had been strangled, but B.B. did not corroborate Tscheu's account. Tscheu also told Deputy Downie that he had never had sex with Thoms. Phone records did not indicate any calls between Thoms and Tscheu, and nothing belonging to Thoms was found at the Tscheu residence. Tscheu became the chief suspect after the semen found in Thoms's rectum matched his DNA database profile on file with the BCA. Tscheu voluntarily provided a second DNA sample, which confirmed the match.

The defense theory was that Tscheu had consensual sex with Thoms the night before her death, and that a third-party perpetrator murdered her. As potential third-party perpetrators, the defense identified two of Thoms's stepsons, Michael and Shawn, and M.H., the half-brother of Thoms's neighbor. Shawn resided in California and no evidence was presented that he was in Minnesota on the date of the crime. Michael could not have committed the murder because he was in prison at that time.

In support of the theory that M.H. committed the murder, the defense called J.J., whose sister, Michelle, was dating M.H. J.J. testified that she saw M.H. and Michelle around 2:30 p.m. on Friday, February 25 in Emily, Minnesota, which is approximately 16 miles away from Thoms's home in Aitkin. According to J.J., M.H. planned to collect some money from Thoms that day. She described M.H.'s mood as "angry" and "furious" and said that around 3:40 p.m. she saw him get into a four-door, dark red- or maroon-colored car. Another defense witness said that she saw a four-door, dark sedan—"either black or dark blue or possibly maroon"—in Thoms's driveway at approximately 5:05 p.m. on February 25. The State contended that because its evidence showed that M.H. picked up a wire transfer in Crosslake, which was 26 minutes from Thoms's residence, at 4:47 p.m., he could not have been at her residence by 5:05 p.m., when the dark sedan was reportedly seen in Thoms's driveway. Moreover, the State offered evidence showing that M.H. was using a pickup truck in the weeks before the murder.

. . .

4

Finally, Tscheu testified on his own behalf and denied that he killed or sexually assaulted Thoms. He said that he drove himself to work on Thursday, February 24, and went to Thoms's home that night to make sure she had firewood. Tscheu claimed that after chopping the wood, he and Thoms talked and then had consensual sex. Tscheu testified that no one knew about their ongoing relationship, because "[i]t was our business." He also testified that he worked on his van and never left home the night of Thoms's death. the State impeached Tscheu with his prior statements to police that he had never had sex with Thoms and that he had not seen her for several months before her murder.

Following his arrest, a grand jury indicted Tscheu for first-degree murder while committing first-degree criminal sexual conduct placing the victim in fear of great bodily harm in violation of Minn. Stat. § 609.185(a)(2) (2006) (Count I), and first-degree murder while committing first-degree criminal sexual conduct causing personal injury in violation of the same statute (Count II). The jury found Tscheu not guilty of Count I and guilty of Count II. The district court convicted Tscheu and sentenced him to life in prison.

*State v. Tscheu*, 758 N.W.2d 849, 852–57 (Minn. 2008).

Petitioner directly appealed his conviction to the Minnesota Supreme Court. On appeal, Petitioner argued that the district court erred (1) by denying his motion for judgment of acquittal at the close of the State's case, (2) by permitting his prior convictions to be used for impeachment, and (3) by admitting hearsay testimony. *Id.* at 852–53. The Minnesota Supreme Court affirmed Petitioner's conviction on December 31, 2008, and judgment was entered on February 18, 2009. *See generally id.*; *see also* Pet'r's Reply Br. 10, ECF No. 13.

Petitioner filed a petition for post-conviction relief in Minnesota District Court on August 25, 2009. The petition was withdrawn without prejudice on October 15, 2009, and it was refiled on December 11, 2009. *Tscheu v. State*, No. 18-K1-05-2752 (Minn. Dist. Ct. Jan. 13, 2012) (attached as Ex. 1 to Petitioner's habeas petition (ECF No. 1-1)). In his petition, Petitioner alleged: (1) a new trial was necessary due to newly discovered evidence; (2) DNA inaccuracies led to his conviction; (3) the state withheld exculpatory evidence; (4) ineffective assistance of both his trial and appellate

5

counsel; (5) prosecutorial misconduct; and (6) the court improperly instructed the jury on "intent and malice." *Id.* at 8–26. After holding an evidentiary hearing, the court denied the post-conviction petition on January 13, 2012. *Id.* Specifically, the court concluded that Petitioner's newly discovered evidence was not credible and, therefore, was not likely to produce a result more favorable to Petitioner. *Id.* The Minnesota Supreme Court affirmed the district court's determination on April 24, 2013. *See Tscheu v. State*, 829 N.W.2d 400 (Minn. 2013).

Petitioner now seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254. *See* Pet. for Habeas Corpus, ECF No. 1. In his Petition, Petitioner raises four grounds for relief: (1) the evidence at trial was insufficient to convict Petitioner of first-degree murder; (2) the trial court denied Petitioner due process by failing to inform Petitioner that the state could impeach him with his past convictions; (3) the trial court allowed hearsay testimony at trial, which violated Petitioner's rights under the Confrontation Clause; and (4) newly discovered evidence entitles Petitioner to a new trial. *See generally id.*

## II. STANDARD OF REVIEW

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") sets forth the standard that governs this Court's review of habeas corpus claims raised by state prisoners. The relevant portion of the AEDPA, 28 U.S.C. § 2254(d), provides that:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). In *Williams v. Taylor*, 529 U.S. 362 (2000), the United States Supreme Court

discussed the meaning of this statute, and how it should be applied by the federal district courts. The

Court held that:

> [A] state-court decision can be "contrary to" this Court's clearly established precedent in two ways. First, a state-court decision is contrary to this Court's precedent if the state court arrives at a conclusion opposite to that reached by this Court on a question of law. Second, a state-court decision is also contrary to this Court's precedent if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to ours . . . .
>
> Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Id*. at 405, 413. The Court further explained the "unreasonable application" clause:

> A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable . . . . [A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable.

*Id*. at 409, 411.

A writ of habeas corpus may also be available where the state court's resolution of a case

is based on "an unreasonable determination of the facts in light of the evidence presented in the state

court proceeding." 28 U.S.C. § 2254(d)(2). In other words, habeas relief may be granted if the state

court's judgment is based on findings of fact that could not reasonably be derived from the

evidentiary record. When reviewing a state court decision, however, a "federal court . . . presumes

that the state court's factual determinations are correct," and that presumption "may be rebutted only

by clear and convincing evidence." *Lee v. Gammon*, 222 F.3d 441, 442 (8th Cir. 2000) (citing 28

U.S.C. § 2254(e)(1)).

7

Therefore, a federal district court is not permitted to conduct its own de novo review of a habeas petitioner's constitutional claims. Habeas relief cannot be granted unless the petitioner has identified, and substantiated, a specific error committed by the state courts. Moreover, he must show that the state courts committed the type of error that is actionable under § 2254(d), as that statute has been interpreted by the Supreme Court in *Williams*. Demonstrating actionable error requires that a petitioner, as a threshold matter, present a federal question in his petition for relief. *See* 28 U.S.C. § 2254(a); *Estelle v. McGuire*, 502 U.S. 62, 68 (1991) ("In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States.").

## III. LEGAL ANALYSIS

### A.      Timeliness of petition

As a threshold matter, Respondent asserts that Grounds 1–3 of Petitioner's petition are untimely and therefore barred by the one-year statute of limitations imposed on habeas petitions. ECF No. 9 at 5 (citing 28 U.S.C. § 2244(d)(1)(A)). In response, Petitioner argues that his Petition is timely. ECF No. 13 at 1–3. The Court agrees with Petitioner.

The AEDPA established a one-year statute of limitations for habeas petitions filed by state prisoners. Specifically, the AEDPA states:

(d)(1)   A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period shall run from the latest of—

    (A)      the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

    (B)      the date on which the impediment to filing an application created by the State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such

State action;

(C)     the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(D)     the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

(2)     The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

28 U.S.C. § 2244(d).

It is well-established that under § 2244(d)(1)(A), the statute of limitations does not start running until either the date judgment becomes final by the conclusion of direct review or the date when the opportunity to seek such review expires:

[T]he running of the statute of limitations imposed by § 2244(d)(1)(A) is triggered by either (i) the conclusion of all direct criminal appeals in the state system, followed by either the completion or denial of certiorari proceedings before the United States Supreme Court; or (ii) if certiorari was not sought, then by the conclusion of all direct criminal appeals in the state system followed by the expiration of the time allotted for filing a petition for the writ.

*Smith v. Bowersox*, 159 F.3d 345, 348 (8th Cir. 1998). Therefore, "'the conclusion of direct review' includes the ninety days a state court defendant has to petition the Supreme Court of the United States for a writ of certiorari." *Jihad v. Hvass*, 267 F.3d 803, 804 (8th Cir. 2011); *see also* Sup. Ct. R. 13.1.

In the present case, Respondent calculates that Petitioner's Petition is untimely by eleven days. ECF No. 9 at 5 (stating that 376 days have passed since the conclusion of Petitioner's original direct appeal). Respondent, however, miscalculated the number of elapsed days. As recognized by

9

§ 2244 and the Eighth Circuit, in instances where the petitioner does not seek certiorari from the

Supreme Court, AEDPA's one year statute of limitations begins to run after the expiration of the

time allotted for filing a petition for a writ of certiorari. *Bowersox*, 159 F.3d at 348. Supreme Court

Rule 13.1 states:

> Unless otherwise provided by law, a petition for a writ of certiorari to review a
> judgment in any case, civil or criminal, entered by a state court of last resort . . . is
> timely when it is filed with the Clerk of this Court within 90 days after entry of the
> judgment.

Here, judgment was entered by the Minnesota Supreme Court on February 18, 2009. Accordingly,

the limitations period in this matter was triggered under § 2244(d)(1)(A) on May 19, 2009—the date

Petitioner's opportunity to file a certiorari petition with the United States Supreme Court expired.

The clock continued running until August 25, 2009, the date Petitioner filed his petition for post-

conviction relief. *See* 28 U.S.C. § 2244(d)(2) (stating that the time during which an application for

state post-conviction relief is pending is not counted toward any period of limitation); *see also*

*Painter v. Iowa*, 247 F.3d 1255, 1256 (8th Cir. 2001) (holding that the time between the date of

direct review of a conviction is completed and the date that an application for state post-conviction

relief is filed counts against the one-year period). Between May 19, 2009 and August 25, 2009,

ninety-eight days elapsed, leaving 267 days remaining of the one-year limitations period.

Petitioner withdrew his petition without prejudice on October 15, 2009, and re-filed his

petition on December 11, 2009. During these dates, fifty-seven days elapsed, leaving 210 days

remaining of the one-year limitations period.

The Minnesota Supreme Court's decision regarding Petitioner's post-conviction petition was

issued on April 24, 2013. However, unlike § 2244(d)(1)(A), § 2244(d)(2) does not toll the statute

of limitations for the ninety-day period during which a petitioner may seek a writ of certiorari from

the U.S. Supreme Court. *See Jihad*, 267 F.3d at 805 (citing *Snow v. Ault*, 238 F.3d 1033, 1035 (8th Cir. 2001)). Accordingly, the statute of limitations began to run again on April 24, 2013. Petitioner filed the present petition on July 31, 2013. Between April 24, 2013 and July 31, 2013, ninety-eight days elapsed, leaving 112 days remaining of the one-year limitations period. Accordingly, Petitioner's petition is timely under AEDPA.[1]

## B.      Sufficiency of the evidence

Petitioner argues in his first ground for habeas relief that "no [rational] trier of fact could have found proof beyond a reasonable doubt that Petitioner committed criminal sexual conduct based on the evidence presented in the State's case." ECF No. 1 at 17. Specifically, Petitioner argues that the trial judge erred by denying his motion for acquittal following the State's case-in-chief. *Id.* In *Slatter v. Leapley*, the Eighth Circuit held that "[a]ny challenge to the sufficiency of the evidence to convict in a state prosecution is necessarily a due process challenge to the conviction." 977 F.2d 1259, 1262 (8th Cir. 1992).

When reviewing the sufficiency of evidence to support a conviction, a federal court's scope of review is "extremely limited." *Sera v. Norris*, 400 F.3d 538, 543 (8th Cir. 2005). As recognized by *Jackson v. Virginia*, 443 U.S. 307 (1979), "a conviction transgresses the bounds of due process if 'no rational trier of fact could have found proof of guilt beyond a reasonable doubt.'" *Nance v. Norris*, 392 F.3d 284, 289–90 (8th Cir. 2004) (citing *Jackson*, 443 U.S. at 324). In other words, "evidence is sufficient to support a conviction whenever, 'after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements

---

[1]

Petitioner seeks to amend his petition to add two Supreme Court cases in support of his argument that his petition is not time-barred. *See* ECF No. 23. Because the Court concludes that his petition is timely, Petitioner's motion to amend is moot.

of the crime beyond a reasonable doubt.'" *Parker v. Matthews*, 132 S. Ct. 2148, 2152 (2012)

(quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). "This standard of review ensures that it is

the fact-finders of a trial, and not reviewing courts, that determine the credibility of testimony and

weigh the evidence in determining guilty or innocence." *Pendleton v. Fabian*, No. 09-733

(JNE/AJB), 2010 WL 145274, at *8 (D. Minn. Jan. 8, 2010) (citing *Sera*, 400 F.3d at 543). The

Court "will not disturb a conviction if the evidence rationally supports two conflicting hypotheses."

*Hill v. Norris*, 96 F.3d 1085, 1088 (8th Cir. 1996) (citing *United States v. Brown*, 921 F.2d 785, 791

(8th Cir. 1990)). Habeas courts accord "great deference" where a state appellate court has found the

evidence supporting the conviction constitutionally sufficient. *Id.*

To convict Petitioner of first-degree murder, the prosecution had to prove that he caused the

death of Thoms while committing or attempting to commit criminal sexual conduct in the first

degree. Minn. Stat. § 609.185(a)(2) (2006). To prove first-degree criminal sexual conduct, the

prosecution had to prove that nonconsensual sexual penetration was accomplished by force or

coercion and accompanied by personal injury to Thoms. *See* Minn. Stat. § 609.342, subdiv. 1(e)(i)

(2006). "Personal injury" is defined as "bodily harm," and includes physical pain or injury. *See*

Minn. Stat. §§ 609.341, subdiv. 8 (2006), 609.02, subdiv. 7 (2006). Only a minimal amount of

physical pain or injury is necessary in order to satisfy the definition of bodily harm. *State v. Jarvis*,

665 N.W.2d 518, 522 (Minn. 2003).

After reviewing the evidence in the light most favorable to the prosecution, the Court

concludes that the Minnesota Supreme Court's decision was not an unreasonable application of, or

contrary to, clearly established federal law. As to the issue of consent, the Minnesota Supreme Court

recognized that the evidence at trial demonstrated that Thoms had bruising on the back of her right

arm that was consistent with the imprint of a thumb, and bruising on the front of that arm consistent with imprints of fingers. *Tscheu*, 758 N.W.2d at 859. The court concluded that these imprints supported the inference that Thoms was forcibly restrained from behind. *Id.* at 860. DNA was also found in Thoms's fingernail clippings that was consistent with Petitioner's DNA. *Id.* The evidence additionally indicated that Petitioner sexually penetrated Thoms's anus, and that he lied to law enforcement officers about not having had sex with Thoms. *Id.* The court concluded that this evidence, considered as a whole, supported the jury's conclusion that the sex was not consensual. *Id.*

As to whether the penetration was accomplished with force or violence and accompanied by personal injury, the Minnesota Supreme Court observed that the evidence supported the inference that Thoms was interrupted when she was tending to her dog and putting groceries away after she came home from work on February 25. *Id.* This interruption caused Thoms's dog to be left outside and perishable items to remain on the kitchen counter. *Id.* The evidence also supported a finding that Thoms was involved in a struggle around the time of her death—Thoms had bruising behind her ear and on her elbow (consistent with falling against counter) and there was also evidence of defense injuries on her left wrist and a finger on her left hand. *Id.*

The Court concludes that this evidence was sufficient to allow a rational juror to conclude that Petitioner committed criminal sexual conduct in the first degree prior to causing Thoms's death. Accordingly, the Minnesota Supreme Court's decision was not inconsistent with clearly established federal law, which only requires that the evidence rationally support a finding of guilt beyond a reasonable doubt. *See Morrow v. Grandlienard*, No. 14-cv-3023 (PJS/BRT), 2015 WL 1782593, at *11 (D. Minn. Apr. 20, 2015). AEDPA therefore precludes federal habeas relief on Petitioner's

13

sufficiency of the evidence claim.

**C.**     **Impeachment of Petitioner with prior convictions**

Petitioner next argues that both his due process rights and right to a fair trial were violated when the State failed to give him adequate notice that it would impeach his testimony with his prior convictions. ECF No. 1 at 7. The Court disagrees.

After Petitioner testified at trial under direct examination, but prior to the State's cross-examination, the State sought judicial permission outside of the hearing of the jury to use Petitioner's prior convictions for impeachment. Resp. Ex. B at 16, ECF No. 10. The defense objected, and the trial court heard arguments from both parties as to the admissibility of the prior convictions. *Id.* at 16–17. Defense counsel acknowledged that it knew of the prior felony convictions the State intended to use as impeachment evidence and that they were admissible under the Minnesota Rules of Evidence. *Id.* However, defense counsel took issue with the fact that the State failed to give notice that it intended to use these convictions and that the State failed to seek a hearing on admissibility of the convictions before Petitioner testified at trial. ECF No. 10, Ex. C at 35–36. In support of this argument, defense counsel cited two Minnesota Supreme Court cases: *State v. Wenberg*, 289 N.W.2d 503 (Minn. 1980) and *State v. Jones*, 271 N.W.2d 534 (Minn. 1978). The court overruled Petitioner's objection, but allowed Petitioner to re-open direct examination in order to inquire about the convictions. *Tscheu*, 758 N.W.2d at 862.

Petitioner raised this issue of notice on appeal, and the Minnesota Supreme Court held that "given the protective steps the district court took here to minimize prejudice to Tscheu, we hold that the court did not abuse its discretion when it allowed the use of Tscheu's prior convictions." *Id.*

After reviewing the record, the Court concludes that the State's failure to give notice that it

would use Petitioner's prior convictions as impeachment evidence was not contrary to, or an unreasonable application of, a clearly established federal law. First, the trial court's evidentiary determination was based on state law, not federal law. Second, the Court is aware of no clearly established federal law that requires a prosecutor to give notice to a defendant that it intends to use his prior convictions that occurred within the previous ten years as impeachment evidence. Petitioner cites to Federal Rule of Evidence 609 as support for his claim. Notwithstanding the fact that the Federal Rules of Evidence are inapplicable to Petitioner's state court proceedings, Rule 609 explicitly states that notice is only required when the prosecution intends to use convictions that are ten years or older. Here, it is undisputed that Petitioner's convictions at issue occurred within the ten years prior to his testimony.

Accordingly, AEDPA precludes federal habeas relief on Petitioner's claim that his due process rights were violated when the prosecution did not give him notice of its intention to use his prior convictions as impeachment evidence.

### D.    Hearsay testimony

Plaintiff alleges that the introduction of certain hearsay testimony at trial constituted plain error that deprived him his rights to due process, confrontation, and a fair trial. ECF No. 1 at 8. Specifically, Petitioner claims that the admission of Agent Eric Jaeche's testimony that a snowplow driver told him that the driver had seen a box-style Jeep or van—the same type owned by Petitioner—in Thoms's driveway around the day of her murder violated his rights under the Confrontation Clause. *Id.* at 18.

The Court adopts the findings of fact made by the Minnesota Supreme Court related to this issue:

> During its case-in-chief, the State presented testimony by Agent Jaeche regarding a snowplow driver who passed Thoms's home the day of her death. Jaeche testified that he asked the driver to go by Thoms's residence, familiarize himself, and try to recall any suspicious activity or vehicles in the area on the date of her death. Jaeche testified that the driver said that sometime around February 25, "he couldn't be exactly sure on the date, . . . he believe[d] that he observed either a box-style Jeep or a box-style van in the driveway of Bonita Thoms." Tscheu drove a silver Dodge minivan at that time. The evidentiary value of the statement at issue was to place Tscheu at Thoms's home on or around February 25.

*Tscheu*, 758 N.W.2d at 863.

The Minnesota Supreme Court determined that Agent Jaeche's statement about what the snowplow driver told him violated the Confrontation Clause. As correctly recognized by the Minnesota Supreme Court, the Confrontation Clause prohibits the "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." *Id.* at 864 (quoting *Crawford v. Washington*, 541 U.S. 813, 821 (2004)). The court determined that the statement made by the snowplow driver was "testimonial" and therefore inadmissible because it was obtained by Agent Jaeche with the purpose of providing evidence at trial. *Id.* However, the court held that "[c]onsidering the vague detail regarding the date the snowplow driver observed the Jeep or van in Thoms's driveway, and Tscheu's own testimony that he visited Thoms at her home the night before her death," the verdict would not have been different had such testimony been properly excluded. *Id.* In making this determination, the court applied a "plain error" standard pursuant to *State v. Griller*, 583 N.W.2d 736 (Minn. 1998).

Petitioner argues that the Minnesota Supreme Court's decision to apply the "plain error" standard in *Griller* was contrary to clearly established federal law. ECF No. 1 at 18. The Court disagrees. Here, Petitioner's trial counsel did not object to the admission of the hearsay testimony

at trial. The Minnesota Supreme Court observed that although Petitioner did not object at trial, the court had the discretion to consider the issue on appeal if there was plain error that affected Petitioner's substantial rights. *See Tscheu*, 758 N.W.2d at 863 (citing *Griller*, 583 N.W.2d at 740). The "plain error" test outlined in *Griller* was taken directly from the U.S. Supreme Court's decision in *Johnson v. United States*, 520 U.S. 461 (1997). As recognized in *Johnson*, "before an appellate court can correct an error that was not raised at trial, there must be (1) 'error,' (2) that is 'plain,' and (3) that 'affect[s] substantial rights.'" 520 U.S. at 466–67. An error affects "substantial rights" when it has a prejudicial effect on the outcome of the trial court proceedings. *See Griller*, 583 N.W.2d at 741 (citing *United States v. Olano*, 507 U.S. 725, 734 (1993)). Accordingly, the Court concludes that the Minnesota Supreme Court's decision to apply the "plain error" test was not contrary to clearly established federal law.

**E.      Newly discovered evidence**

Finally, Petitioner claims that "[n]ewly discovered evidence entitles [him] to a new trial because it would probably lead to an acquittal or more favorable result for petitioner." ECF No. 1 at 10. Petitioner, however, did not offer any affidavits or attach evidence to his petition. Rather, it appears that Petitioner seeks the Court to simply re-weigh the "new evidence" that he submitted to the Minnesota district court in his state court petition for post-conviction relief. Indeed, Petitioner specifically requests that the Court "view what is in the records to see if the District Judges [sic] denial of post-conviction relief was a abuse-of-discretion [sic] on his part." ECF No. 1 at 19. Essentially, Petitioner seeks this Court to sit as another appellate court and offer a second review of the post-conviction court's determination, even though the Minnesota Supreme Court already affirmed the court's decision. *See Tscheu*, 829 N.W.2d 400 (Minn. 2013).

It is well-established that in a habeas petition brought by state prisoners, federal courts cannot act as triers of fact; they can only review alleged constitutional errors. *See Wolfs v. Britton*, 509 F.2d 304 (8th Cir. 1975) ("[T]he Federal courts do not sit in supervisory review of the state courts."). The Court therefore declines Petitioner's request for this Court to reweigh the relevant evidence, including his purported "newly discovered evidence," and make an independent determination that he should be awarded a new trial.

That being said, the Court recognizes that the state post-conviction court granted Petitioner an evidentiary hearing where Petitioner was given the opportunity to present his newly discovered evidence. After considering all of the submissions by Petitioner, the court issued a thorough and well-reasoned opinion, denying Petitioner's request for post-conviction relief based on the conclusion that the newly discovered evidence was not credible and therefore not likely to produce a result more favorable to Petitioner. *See* ECF No. 1-1. Petitioner appealed this determination directly to the Minnesota Supreme Court, who affirmed the post-conviction court's decision. *Tscheu*, 829 N.W.2d 400. Specifically, the Minnesota Supreme Court held that the record supported the post-conviction court's credibility determination. *Id.* at 401.

This conclusion was not an unreasonable determination of the facts in light of the evidence presented or an unreasonable application of clearly established federal law. After reviewing the record, the Court concludes that the determinations by the post-conviction court and the state supreme court were reasonable given the inconsistencies and conflicting facts in the witnesses' testimony. Indeed, the testimony of the new witnesses were not only inconsistent with each other, but the testimony also contradicted undisputed facts that were adduced at trial. Accordingly, the Court concludes that to the extent Petitioner seeks habeas relief based on newly discovered

18

evidence, the petition must be denied.

## IV. ORDER AND RECOMMENDATION

Based upon the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY**

**RECOMMENDED** that:

    A.    Petitioner's Petition Under 28 U.S.C. § 2254 for Writ of Habeas Corpus by a Person in State Custody (ECF No. 1) be **DENIED**; and

    B.    This matter be **DISMISSED WITH PREJUDICE.**

Additionally, **IT IS HEREBY ORDERED** that Petitioner's motion to amend his petition (ECF No.

23) is **DENIED as moot**.


DATED: November 19, 2015                  *s/Franklin L. Noel*
                                        FRANKLIN L. NOEL
                                        United States Magistrate Judge


## NOTICE:

**Filing Objections:**  This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation.  A party may respond to those objections within 14 days after being served a copy of the objections.  LR 72.2(b)(2).  All objections and responses must comply with the word or line limits set for in LR 72.2(c).

**Under Advisement Date:**  This Report and Recommendation will be considered under advisement 14 days from the date of its filing.  If timely objections are filed, this Report and Recommendation will be considered under advisement from the earlier of: (1) 14 days after the objections are filed; or (2) from the date a timely response is filed.